**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Victor RODRIGUEZ,**
**Defendant–Appellant.**

**No. 87–5139.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1988.

Decided March 6, 1989.

Anthony J. Scremin, P.A., Miami, Fla., for defendant-appellant.

James P. Walsh, Jr., Asst. U.S. Atty., Chief, Major Narcotics Section, and Joe McGinnis, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before PREGERSON, WIGGINS and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

## BACKGROUND

In 1982, Officer MacNeil of the Glendale, California Police Department began receiving information—reports from other narcotics officers and a corroborated tip from a citizen informant—which led him to suspect that Jaime Giraldo was distributing cocaine in the area. This suspicion was reinforced when MacNeil discovered a connection between Giraldo and the victim of a 1985 cocaine-related murder. Subsequent information, obtained from informants, anonymous tips, and warranted searches of various residences, prompted MacNeil to commence surveillance of Giraldo and those suspected of participation in Giraldo's narcotics organization.

During the period between May 27, 1986 and June 2, 1986, MacNeil and other officers observed a continuous pattern of activity. This activity, centering around four residences in the Los Angeles area, was consistent with MacNeil's suspicions of narcotics distribution.

On June 2, surveillance observed two vehicles, a pickup truck and a van, enter the garage of a suspect residence in Southgate, California. As both vehicles departed, the van was seen to contain two large cardboard boxes that it did not contain earlier. The two vehicles proceeded to a nearby taco stand where the drivers met two other men, subsequently identified as Victor Rodriguez and Kevin Martin. Martin assumed possession of the van and drove away, followed by Rodriguez in a Buick. The other two men departed in the pickup truck.

The van eventually entered the garage of what was later found to be Martin's residence in Montclair, California. Rodriguez parked the Buick a few blocks away and joined Martin. Subsequently, two women and five children visited the residence, and departed shortly in the Buick. After 45 minutes, the van emerged from the garage with Martin as driver and Rodriguez as passenger. However, before the van could leave the area, it was stopped by two surveilling officers.

The officers approached with weapons drawn and ordered Rodriguez and Martin from the van. After identifying themselves, the officers allegedly noticed Rodriguez placing an object into his jacket pocket. They asked Rodriguez for identification, and inquired about the object (the officers allegedly had holstered their weapons at this point). Rodriguez supplied his name and address, but denied that there was anything in his pocket. The officers then asked Martin if he owned the van; Martin stated that he did, and granted them permission to search the van. Four empty duffle bags and a portable cellular telephone were found.

The officers then frisked Rodriguez and felt a cylindrical object. They allegedly asked Rodriguez for, and received, permission to search the pocket. The officers retrieved a small plastic film canister, which they opened, and discovered that it contained a white powder resembling cocaine. At that point, the officers placed Rodriguez and Martin under formal arrest for conspiracy to transport and sell cocaine.

Following the arrests, the officers asked Rodriguez for permission to search his residence. Rodriguez stated that his wife had approximately $20,000 in the house that he did not want the officers to take. Believing this to be only qualified consent, they allegedly refrained from conducting a full search. They did, however, conduct a warrantless entry to secure Rodriguez' residence from other potential occupants. Martin declined to give the officers consent to search his residence, and apparently no warrantless entry was conducted.

Shortly thereafter, MacNeil applied for and obtained a telephonic warrant to search a number of residences, including

the residences of Rodriguez and Martin. During the searches, the police found, among other things, approximately 124 kilograms of cocaine and transaction ledgers at Martin's residence, and approximately $38,000 in cash at Rodriguez' residence. As a result of the foregoing, Rodriguez, Martin, and eight others (including Giraldo) were indicted by a grand jury in the Central District of California.

Rodriguez and Martin were charged with possession with intent to distribute 120 kilograms of cocaine; distribution of 100 kilograms of cocaine; and conspiracy to do the same. They pleaded not guilty, and subsequently filed joint motions to quash the search warrant and suppress evidence. After a hearing, the district judge denied the motions. Rodriguez and Martin then withdrew their earlier pleas and entered conditional pleas of guilty to all but the conspiracy count, which was dropped. Rodriguez was sentenced to twenty years imprisonment, Martin was sentenced to eight years imprisonment, and both were fined $100.

Rodriguez is the only defendant involved in this appeal. Essentially as raised in his motion to quash the search warrant and suppress evidence, Rodriguez challenges the officers' justification for stopping the van, conducting a search incident to that stop, entering his residence without a search warrant, and subsequently obtaining a search warrant (which he also claims was overbroad).

## DISCUSSION

### A. *The Detention and Arrest*

Rodriguez raises three alternative challenges to his detention and arrest. First, he argues that the officers were unjustified in stopping the van because they reasonably could not have suspected that criminal activity was afoot. Second, he argues that the detention was so intrusive that it amounted to an arrest, unsupported by the requisite probable cause. Third, he argues that at a minimum, probable cause was lacking at the time he was formally arrested. The government contends that the officers possessed probable cause to arrest Rodriguez and Martin before the van was

stopped, and that therefore, the detention and formal arrest were constitutionally justified.

■ The initial inquiry is whether and when the surveilling officers acquired probable cause to arrest Rodriguez and Martin. This court has stated the standard as follows:

> Arresting officers have probable cause to make warrantless arrests if, at the moment of arrest, facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense.

*United States v. Hillison*, 733 F.2d 692, 697 (9th Cir.1984) (citing *United States v. Martin*, 509 F.2d 1211 (9th Cir.), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975)).

The circumstances preceding and surrounding the stopping of the van are set forth in the transcript of the June 2, 1986 telephonic affidavit accompanying MacNeil's application for the search warrant in this case. The first portion of the affidavit establishes that MacNeil had significant information from various sources linking Giraldo and others to narcotics trafficking—information from other narcotics officers, a corroborated tip from a citizen informant, a connection with a cocaine-related murder, observations made during a warranted search of Giraldo's suspected residence, and certain facts from a follow-up investigation.

The affidavit then describes three additional tips, two of which were from anonymous sources. Contrary to the claims of Rodriguez in his brief, the information provided on those three instances was substantially corroborated and indicates credibility and reliability. For example, the first anonymous letter stated that a large sum of cocaine-related U.S. currency would be found at a Glendale apartment in which Anna Chica resided, and that this currency belonged to Muriel Chica, who resided in Pasadena. A consent search of the Glendale apartment produced $140,000 U.S. dol-

lars and an alert from a narcotics dog. Anna Chica was present at the time of the search, along with a resident of the Pasadena address. In short, that first anonymous tip was quite accurate.

The police did not have the opportunity to corroborate entirely the second anonymous letter. However, they did corroborate the information concerning the new addresses of Giraldo, one of his sons, and other suspects (the Munozes). Additionally, Anna Chica was seen at one of the addresses in the letter. Again, this anonymous tip proved to be quite credible and reliable. The third tip, from an informant, gave the whereabouts of Giraldo's second son, and stated that he was still involved in the narcotics trafficking. This information was corroborated in the ensuing surveillance.

The affidavit then describes an elaborate course of surveillance during which the focus was on Giraldo, his sons, and others that were under suspicion. Although no cocaine was actually observed during the five days of surveillance, the officers believed they saw two large stacks of U.S. currency, overheard a suspicious telephone conversation, observed a flurry of activity including frequent trips to the airport, and observed evasive driving among other things.

Rodriguez argues that this activity is not probative of criminal activity. Taken alone he may be correct. But when viewed in light of the tips and other circumstances noted above, this same activity appears highly suspicious. It is not uncommon for seemingly innocent conduct to provide the basis for probable cause. *See Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983).

At this point probable cause existed to arrest the various members of the Giraldo operation and obtain warrants to search their residences. It was at this point that Rodriguez and Martin were seen at the taco stand taking delivery of the van in-cluding the two large boxes from one of the suspect residences. This sole observation created the fair probability that Rodriguez and Martin were connected to Giraldo, and extended the probable cause to them. Thus, the police would have been justified in stopping the van and arresting Rodriguez and Martin at any time thereafter.

Rodriguez argues that mere association with suspected criminals cannot provide the basis for probable cause. *See Ybarra v. Illinois,* 444 U.S. 85, 91–92, 100 S.Ct. 338, 342–43, 62 L.Ed.2d 238 (1979); *Sibron v. State of New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968). But Rodriguez and Martin were seen doing more than associating. They were seen as participants in a chain of conduct that was considered by the police to be an ongoing criminal operation. Their overt acts were viewed as part of the commission of the crime. *Ybarra* and *Sibron* cannot be read so broadly as to encompass the observations made in this case.

The affidavit then describes the continued surveillance of Rodriguez and Martin. This included the observation of arguably suspicious counter-surveillance driving and parking behavior. The probable cause that already existed was not eroded by the officers' inability to view the two large boxes in the van when it departed from Martin's residence. After 45 minutes in Martin's garage, the boxes could have been opened and broken down into smaller, less visible packages. As a result, when the officers decided to stop the van, they were still in possession of probable cause, and the stop was justified.[1]

When the officers approached the van with their weapons drawn and ordered Rodriguez and Martin out of the van at gunpoint, the detention amounted to an arrest. *See United States v. Ramos–Zaragosa,* 516 F.2d 141, 144 (9th Cir.1975). But it was no less justified based on the probable cause that existed from the onset of the detention. Incident to this arrest, the offi-

---

**1.** Because we find the stop of the van to have been supported by probable cause, we need not address Rodriguez' contention that the stop began as an investigatory detention unsupported by the reasonable suspicion required by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.

cers were justified in opening the small canister found on Rodriguez' person. *See New York v. Belton,* 453 U.S. 454, 457–62, 101 S.Ct. 2860, 2862–65, 69 L.Ed.2d 768 (1981); *United States v. Robinson,* 414 U.S. 218, 234–37, 94 S.Ct. 467, 476–78, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). The absence of a formal arrest did not destroy this exception to the warrant requirement. *See United States, ex rel. Walls v. Mancusi,* 406 F.2d 505, 508–09 (2d Cir.), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969).

Accordingly, we reject Rodriguez' challenges to his detention and arrest.[2]

B. *The Search Warrant—Probable Cause*

We next consider whether the probable cause that existed extended beyond the justification to arrest Rodriguez and Martin to the justification required to obtain a warrant to search their residences. The standard we apply is best summarized as follows:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court

is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

The totality of the factors set forth in the affidavit clearly provided the issuing judge with a substantial basis to conclude that Rodriguez and Martin were engaged in an ongoing scheme of cocaine distribution. Thus, the judge was justified in authorizing the search for and seizure of contraband ("cocaine"), instrumentalities ("narcotic paraphernalia" and "safes or lock boxes"), fruits ("U.S. currency"), and evidence (of "sales of cocaine," "a conspiracy to sell cocaine," and "the identity of persons in control").[3] The nexus between these articles of property and the suspected criminal behavior is patent. The question becomes whether there existed a reasonable nexus between the articles and the residences of Rodriguez and Martin. *See generally United States v. Rubio,* 727 F.2d 786, 792–93 (9th Cir.1983).

Because Rodriguez and Martin drove the van, which contained the large boxes, from the taco stand to Martin's residence, and because they drove the van away from Martin's residence without the boxes, there was a substantial basis to conclude that the boxes had been left at Martin's residence. Because the boxes were received from the Giraldo operation, and because cocaine was discovered on Rodriguez' person at the

---

**2.** Rodriguez also contends that at some point during the seizure, he uttered inculpatory statements. He seeks to suppress admission of those statements based on *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This argument is without merit. Although in custody, Rodriguez has not demonstrated that he was responding to any form of interrogation. Without interrogation, *Miranda* is inapplicable. *See Rhode Island v. Innis,* 446 U.S. 291–298 n. 2, 100 S.Ct. 1682, 1688 n. 2, 64 L.Ed.2d 297 (1980). Accordingly, we reject Rodriguez' contention.

**3.** That portion of the warrant specifying the property to be seized reads as follows:

Cocaine, and narcotic paraphernalia, consisting in part of and including, but not limited to, milk sugar, scales and other weighing devices, paper bindles, measuring devices, and

containers of various types commonly associated with the storage and use of cocaine; articles of personal property tending to establish and document sales of cocaine, consisting of U.S. currency, buyer lists, seller lists, and recordations of sales; articles of personal property tending to establish the existence of a conspiracy to sell cocaine, consisting of and including personal telephone books, address books, telephone bills, papers and documents containing lists of names; articles of personal property tending to establish the identity of persons in control of the premises, vehicles, storage areas or containers where cocaine may be found consisting of utility company receipts, rent receipts, canceled mail envelopes and keys; and safes or lock boxes.

time of the arrest, there was a substantial basis to conclude that the boxes contained cocaine. And the large size of the boxes was indicative of a quantity of cocaine that was likely intended for further distribution. Once Martin's residence became so connected with the advancement of the Giraldo distribution scheme, there arose a fair probability that, in addition to contraband, fruits, instrumentalities, and evidence of that scheme would be found on the premises.

The nexus with Rodriguez' residence is derivative of the nexus with Martin's residence. The proximity of the two houses does not, by itself, implicate Rodriguez' residence. However, the affidavit states that the van was stopped, after its departure from Martin's garage, within one block of Rodriguez' residence, and that Rodriguez and Martin declared that such was their destination. Additionally, cocaine had been discovered on Rodriguez' person and his Buick had played an integral part in the suspected criminal behavior. Although these factors are not as compelling as those concerning Martin's residence, they nonetheless raise a fair probability that Rodriguez' residence would contain property intimately connected with the possession and distribution of cocaine.

Consequently, we hold that the search warrant, as it related to both residences, was supported by sufficient probable cause.

## C. *The Initial Warrantless Entry*

Rodriguez also contends that even if the warrant to search his residence was supported by probable cause, the evidence seized thereunder must be suppressed because of the unlawful nature of the initial warrantless entry. The crux of his position is that absent exigent circumstances, a warrantless entry renders excludable all subsequently seized items.

■ This court has held that exigent circumstances exist to justify a warrantless entry if officers act on probable cause, in good faith, and with a reasonable belief, from the totality of the circumstances, that evidence or contraband will imminently be

destroyed. *See United States v. Hicks,* 752 F.2d 379, 383 (9th Cir.1985) (citing *United States v. Kunkler,* 679 F.2d 187, 191–92 (9th Cir.1982)). The burden of establishing this exception to the warrant requirement is on the government. *United States v. Gardner,* 627 F.2d 906, 909 (9th Cir.1980).

■ The government has alleged one particular factor which arguably demonstrates exigent circumstances. One of the arresting officers noted that several cars had driven slowly by the arrest scene. He reasoned that these drivers might proceed to Rodriguez' residence, less than one block away, and warn other potential occupants. The officer believed that the two women who had left Martin's residence in Rodriguez' Buick earlier that day were likely occupants of Rodriguez' residence. The obvious implication is that the officer feared the removal or destruction of evidence.

The government does not, however, expand upon its entry of Rodriguez' residence. For example, there is no evidence that the officers attempted to determine whether the house was occupied prior to entry. *See, e.g., Hicks,* 752 F.2d at 383; *United States v. Salvador,* 740 F.2d 752, 758 (9th Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). Moreover, the circumstances of this case are much less compelling than the aforecited cases. Thus, the existence of exigent circumstances in this case remains highly questionable.

Nevertheless, we find that we need not resolve this question because, assuming the warrantless entry of Rodriguez' residence was unlawful, the admissibility at trial of property seized under the warrant remains unaffected. In *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Court held that the absence of exigent circumstances, although rendering the warrantless entry of the premises unlawful, does not automatically render unlawful the act of securing the premises while a search warrant is being sought. *Id.* at 810–11, 104 S.Ct. at 3388–

89. So long as the "seizure" of the premises was supported by probable cause, and not otherwise unreasonable, items subsequently seized under the valid warrant are not directly excludable. *Id.* at 812–15, 104 S.Ct. at 3389–91.

Applying *Segura,* the entry of Rodriguez' residence may have been unlawful, but the act of securing the residence was not unlawful at its inception. ·And the record does not permit the conclusion that the "seizure" of the house became unreasonable at some point thereafter. As we have discussed, the police had probable cause to believe that a subsequent warranted search would produce property intimately connected with the possession and distribution of cocaine. The duration of the seizure was from mid-afternoon to mid-evening on June 2, 1986. That is not an unreasonable amount of time to obtain a warrant, and does not evidence bad faith. *See Segura,* 468 U.S. at 812–13, 104 S.Ct. at 3389–90 (nineteen hours not unreasonable under the circumstances). There does seem to be a dispute over whether the officers conducted a search for more than occupants while on the premises. However, in light of *Segura,* the district court could not have denied Rodriguez and Martin's motions to quash the search warrant and to suppress evidence without resolving this factual dispute in favor of the government. Such factual disputes rest primarily on credibility determinations, and this court is not in a position to make a clearer credibility determination than that made by the district court.[4] *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Therefore, the items later seized pursuant to the search warrant are not excludable as a direct result of the warrantless entry of Rodriguez' residence.

Nor are they excludable as an indirect result of that entry. The probable cause supporting the warrant was not based on any observations or evidence derived from the warrantless entry. The operative facts and circumstances included in the affidavit were derived entirely from an "independent source," the surveillance and investigation that preceded the entry. Therefore, the warrant was not tainted, *see Segura,* 468 U.S. at 804–05, 104 S.Ct. at 3385–86, and we reject Rodriguez' challenge based on the unlawfulness of the initial, warrantless entry of his residence.

## D. *The Search Warrant—Overbreadth*

Rodriguez further contends that even if the warrant to search his residence was based on probable cause, it was overbroad both on its face and as executed. In particular, he focuses on that portion of the warrant which authorizes the police to search for "articles of personal property tending to establish the existence of a conspiracy to sell cocaine, consisting of and including personal telephone books, address books, telephone bills, papers and documents containing lists of names...."

The purpose of the Fourth Amendment's particularity requirement for warrants is to make general searches impossible. *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The evil to be prohibited is the "exploratory rummaging in a person's belongings." *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). Although the police are not to be allowed to exercise discretion as to items to be seized, *Marron,* 275 U.S. at 196, 48 S.Ct. at 76, the warrant's description of items need only be " 'reasonably specific, rather than elaborately detailed....' " *United States v. Storage Spaces Designated Nos. 8 & 49,* 777 F.2d 1363, 1368 (9th Cir.1985), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987) (quoting *United States v. Brock,* 667 F.2d 1311, 1322 (9th Cir. 1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983)).

---

4. A review of the list of items seized from Rodriguez' residence pursuant to the warrant reveals one important fact. All of the items were discovered in remote locations—dresser drawers, closets, pocket, knapsack. Crediting the government's statement that only a search for occupants was conducted prior to the issuance of the search warrant, these items would not have been discovered in plain view at that time.

In this case, the challenged language is particular in three aspects. First, it directs the police to seize evidence of a specific crime—"conspiracy to sell" drugs. Second, it focuses the police on a specific drug—"cocaine." *Cf. Andresen,* 427 U.S. at 480–82, 96 S.Ct. at 2748–49 (warrant focuses on specific crime involving specific land). Third, it offers the police guidance by providing a list of specific items—"personal telephone books, address books, telephone bills, papers and documents containing lists of names." The paragraph does not authorize a broad, limitless rummaging of Rodriguez' possessions.

Rodriguez argues that our decision in *United States v. Washington,* 797 F.2d 1461, 1473 (9th Cir.1986), compels a finding of overbreadth in this case. In *Washington* we found overbroad a section of a warrant that authorized police to seize "evidence of association" of the suspect with named persons, "but not limited to them". *Id.* at 1473. By authorizing the police to seize personal telephone books, lists of names, etc., the warrant in this case vaguely resembles that in *Washington.* However, the warrant in this case is considerably more particular. In *Washington,* the overbroad paragraph was devoid of any limits such as a reference to a specific crime. Thus, the language of that warrant —"evidence of association" with names persons, "but not limited to them"—was unbounded. In this case, the challenged language is very specific as to the criminal activity of which evidence of association was to be seized.

That the challenged paragraph did not include a finite list of names to be searched for in Rodriguez' papers does not create overbreadth. The record reveals that, although the police were well aware of the names of certain participants in the alleged cocaine conspiracy, many participants were observed to be involved. Inclusion in the warrant of a partial, non-conclusive list of names would have provided Rodriguez no additional protection from a general search. *Cf. United States v. Bright,* 630 F.2d 804, 812 (5th Cir.1980). In the absence of complete and detailed knowledge on the part of the police, the issuing judge was justified in authorizing the search for these generic classes of items. *See United States v. Hillyard,* 677 F.2d 1336, 1339–40 (9th Cir. 1982) (citing *United States v. Cook,* 657 F.2d 730, 733 (5th Cir.1981)). We therefore find no facial overbreadth.

Concerning his claim that the warrant was overbroad in its execution, Rodriguez argues that certain evidence seized was not described in the warrant. We disagree. With few exceptions, the "innocuous items," emphasized in Rodriguez' brief (such as cellular telephone tolls and a suitcase), fit neatly into the warrants' authorization, which we have found not to be overbroad. In particular, the cellular telephone and paging equipment found in Rodriguez' residence tend "to establish the existence of a conspiracy to sell cocaine." *See United States v. Crespo de Llano,* 830 F.2d 1532, 1544 (9th Cir.1987). Those which arguably do not are so innocuous (such as tape and note pads) that their seizure was harmless in the overall execution of the warrant. Rodriguez' claim of overbreadth in the execution of the warrant is therefore rejected.

## CONCLUSION

In conclusion, the officers were justified in stopping the van based on probable cause derived from their knowledge and observations up to that point. This probable cause also provided justification for the effective arrest which resulted, the search incident to that arrest, and the formal arrest which ensued. Assuming that the warrantless entry of Rodriguez' residence was unlawful, the items subsequently seized under the search warrant are not excludable. The warrant was supported by probable cause, derived from a source independent of the warrantless entry; and, it was not overbroad either on its face or as executed.

Accordingly, the district court's denial of Rodriguez' motions to quash the search warrant and suppress evidence, and Rodri-

guez' conviction, are affirmed.[5]

AFFIRMED.

PREGERSON, J., concurs in the result.

---

5. The government has argued that we should limit our focus to the validity of the search warrant as it applied to Rodriguez' residence. It contends that Rodriguez has no standing to challenge the warrant as it applied to Martin's residence. Whereas the government uses the term "standing" in its argument, this issue is no longer viewed as one of standing. Rather, the issue is whether Rodriguez' substantive Fourth Amendment rights were violated. *See United States v. Perez*, 644 F.2d 1299, 1303 nn. 1, 2 (9th Cir.1981). The relevant inquiry is whether Rodriguez had a "legitimate expectation of privacy"

in Martin's residence. *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The district court did not address this question because in that court, Rodriguez' challenge was joined by Martin (who is not before this court). However, we need not remand this question for further findings in the district court; even if Rodriguez had a legitimate expectation of privacy in Martin's residence, the record reveals that the warrant to search that residence was not constitutionally infirm, as we have discussed. Thus, Rodriguez' challenge is without merit.